**Below is a Memorandum Decision of the Court.**

**Christopher M. Alston**
**U.S. Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

Christopher M. Alston
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6301
Seattle, WA 98101
206-370-5330

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re | Chapter 11 |
| NORTHWEST TERRITORIAL MINT, LLC, | Case No.  16-11767-CMA |
| Debtor. | |
| MARK CALVERT, *as Chapter 11 Trustee of Northwest Territorial Mint, LLC*, | Adv. Case No.  16-01217-CMA |
| Plaintiff, | |
| v. | |
| DIANE ERDMAN, *an individual*, | MEMORANDUM DECISION |
| Defendant. | |

The Court conducted a bench trial in this adversary proceeding on January 30 and 31, 2018.  David Neu and K&L Gates LLP represented Plaintiff Mark Calvert, the Chapter 11 Trustee (the "Trustee") of the estate of Northwest Territorial Mint, LLC (the "Mint").  Thomas Quinlan and Smith Alling PS represented Defendant Diane Erdmann.  The Court requested

MEMORANDUM DECISION - 1

additional briefing and heard closing arguments on February 6, 2018, and then took the matter under advisement.

At trial, the Trustee asserted the Mint's payment of Ms. Erdmann's personal American Express bills gave rise to claims of constructive and intentional fraudulent transfers under the Washington Uniform Fraudulent Transfer Act and United States Bankruptcy Code, and a claim of unjust enrichment under Washington State law. Ms. Erdmann asserted that the obligations satisfied by the payments to American Express largely benefitted the Mint and contested liability.

For the reasons stated below, the Court finds and concludes that the Mint's payments to American Express were for the benefit of Ms. Erdmann, the Mint did not receive reasonably equivalent value for the payments, and the Mint knew or should have known it was unable to pay its debts when they became due when it made the payments. However, Ms. Erdmann is entitled to credit for the value conveyed to the Mint with each payment. The Court will enter judgement against Ms. Erdmann and in favor of the Trustee for an amount equal to the transfers, less the charges on the American Express account that were for business purposes.

## I.      FINDINGS OF FACT

A. <u>Background on the Mint and the Amex Account.</u>

The Mint filed a voluntary petition under chapter 11 of the Bankruptcy Code on April 1, 2016 (the "Petition Date"). At the time of the filing, the Mint billed itself as the largest private mint in the United States, employing approximately 240 employees at facilities in six states. The Mint's business operations included custom minting of medals and commemorative coins as well as on-line and walk-in sale of precious metals and coins. Ross Hansen was the 100% owner, sole manager, sole member, and Chief Executive Officer of the Mint. Seven days after commencing its voluntary case, the Mint stipulated to the appointment of a chapter 11 trustee, and the Court approved the appointment of Mark Calvert just four days later.

Ms. Erdmann and Mr. Hansen met in 1997, when Ms. Erdmann purchased gold and silver coins from the Mint. The two of them have lived together since 2000. While they claim to

maintain separate bank accounts, Ms. Erdmann and Mr. Hansen jointly own pets and share household expenses. Mr. Hansen is considered the "breadwinner" and Ms. Erdmann ensures payment of household bills. Ms. Erdmann worked at the Mint as vault manager, a role that required her to control the flow and fulfillment of customer orders and to keep control over precious metal inventory. Though she worked long hours—up to 100 hours per week, according to Mr. Hansen—she never received any salary, benefits, or compensation from the company.

In 2000, Diane Erdmann opened an American Express Platinum account (the "Amex Account"). While the Mint was not an account holder, Ms. Erdmann authorized Mr. Hansen to charge purchases on the account. Ms. Erdmann received one reward point for every dollar charged, and she linked the Amex Account to her Amazon.com and PayPal.com accounts. Both Ms. Erdmann and Mr. Hansen charged the Mint business-related expenses on the Amex Account. Neither Mr. Hansen nor the Mint were ever liable to American Express for the amounts charged on Ms. Erdmann's account.

B. <u>Over Many Years, Ms. Erdmann and Mr. Hansen Made Substantial Charges on the Amex Account.</u>

Each month, Mr. Hansen and Ms. Erdmann charged numerous purchases on the Amex Account. Ms. Erdmann acknowledged that they used the account for both business and personal reasons to obtain reward points, which they could in turn use to purchase goods and services. During the four-year period before the commencement of the chapter 11 case, Ms. Erdmann accrued approximately 3.5 million Amex reward points. While contending that the Mint used most of these points, Ms. Erdmann conceded that she used some of them to acquire items for herself and Mr. Hansen.

The Trustee alleges Ms. Erdmann and Mr. Hansen made numerous monthly charges on the account during the four-year period prior to the petition date for their personal benefit. The Trustee has categorized those charges and determined the amounts spent in each category. The expenditures identified by the Trustee as personal include the following in the stated approximate amounts:

PayPal: $108,158.00

Grocery, Drug, and Convenience Stores: $85,883.00

Travel/Lodging: $77,235.00

Amazon.com: $41,809.00

Costco/Sam's Club: $28,192.00

Clothing/Apparel: $22,034.00

Gas/Auto: $18,370.00

Medical Expenses: $18,115.00

Entertainment: $17,097.00

Veterinarian and Pet-related Expenses: $16,201.00

Restaurants: $15,191.00

Home Improvement/Crafts: $6,309.00

Fitness/Beauty Products: $4,949.00

Sporting Goods: $1,536.00

The Trustee offered a summary of the charges he contends were personal in nature for each month. Exh. P-35. Ms. Erdmann testified extensively on these alleged personal charges. While disputing the personal categorization of some of the charges, Ms. Erdmann essentially confirmed that most of the expenses in most of these categories were personal in nature.

Medical: Ms. Erdmann admitted that she and Mr. Hansen incurred the charges listed in this category for personal reasons, even though she did not agree that all of the listed charges were for medical treatment.

Fitness/Beauty Products, Clothing/Apparel, and Home Improvement/Crafts: Ms. Erdmann guessed that some of the expenses might have been gifts for company employees or somehow related to the business, but conceded many of the charges must have been personal. Her inability to identify a credible basis for when or why she or Mr. Hansen would allegedly buy employee gifts, coupled with a lack of any corporate documents or records to support this practice, leads the Court to reject her testimony that many, if any, of the these charges were corporate gifts.

Vet/Pet-Related: Ms. Erdmann asserted that some of the charges could have been for military identification tags for service dogs, but acknowledged that most of the charges were for the dogs she and Mr. Hansen owned.

Gas/Auto: Ms. Erdmann acknowledged these charges included gas that went into vehicles that she and Mr. Hansen owned, but she testified the Mint used her vehicle and therefore the gas charges were business expenses. She provided no company records or tax returns to support her claim that the company used her vehicle to such an extent that she was entitled to have the company pay for gas for her personal or non-business travel. The Trustee did include charges for plane tickets on the list of Gas/Auto expenses that should have been included in the Travel/Lodging category. Given the timing and frequency of the charges, it does appear that these plane tickets were more likely than not for business trips.

Grocery, Drug, and Convenience Stores and Costco/Sam's Club (collectively the "Grocery Charges"): Ms. Erdmann asserted that most of these expenses were for the business because she and Mr. Hansen often bought food and supplies for the Mint. On cross-examination, she conceded that after September 2012, the Mint tasked an employee with purchasing food and supplies for the company. She therefore agreed that any Costco/Sam's Clubs charges after that time were almost entirely personal. Further, Ms. Erdmann admitted that whenever she made Grocery Charges for the company, she always included items for personal use and consumption and that she always used the Amex Account to buy all household groceries to obtain the rewards points. Finally, after the Mint commenced this case and Ms. Erdmann and Mr. Hansen ceased using the Amex Account for Mint business, they continued to make sizable Grocery Charges that were comparable in amount to the pre-petition purchases. *See* Exh. P-35 and Exh. P-2.

Entertainment and Travel/Lodging: Ms. Erdmann testified she had stopped traveling for work after 2012 and admitted that many of expenses were personal, but nonetheless declared that she considered many of these expenses to be business-related. These expenses included tickets and travel to Disneyland, science-fiction conventions, concerts, and other entertainment venues. Ms. Erdmann acknowledged she attended these events, but she noted that on many occasions one or more Mint employees accompanied her at the Mint's expense, purportedly as a bonus or

benefit to the employee. She concluded that if an employee went to the event, the entire expense was business-related. Ms. Erdmann conceded, however, that these employees were all friends. Further, she had no decision-making authority at the Mint, and neither she nor Mr. Hansen testified that Mr. Hansen had either authorized any of the alleged employee benefits or granted Ms. Erdmann the authority to do so. Finally, Ms. Erdmann offered no company financial records, tax returns, or documents to support her claim that the Mint distributed bonuses in the form of tickets for entertainment or travel. The Court finds Ms. Erdmann's testimony is not credible and is merely an after-the-fact justification for these Entertainment and Travel expenses that were for her personal benefit.

PayPal: Ms. Erdmann acknowledged that many of the charges were for personal items, such as T-shirts, costume jewelry, and felted animals, purchased from e-commerce websites such as Etsy and eBay. She argued charges that involved foreign currencies or had the term "professional services" were made by Mr. Hansen and related to the business. Mr. Hansen testified that he purchased books, collectibles, art, and antiques for the Mint to create new images for coins and medals and to replace items in the company archives. The Court notes that prior to the bankruptcy, all PayPal activity occurred on Ms. Erdmann's credit card. Even though she testified that Mr. Hansen did much of the purchasing on their joint PayPal account for business purposes, it is impossible for the Court to verify either what was purchased or who made the purchases. Further, Ms. Erdmann and Mr. Hansen continued to make a large number of PayPal charges after the bankruptcy filing—including transactions in foreign currencies and transactions identified as "professional services." After the chapter 11 case had been pending for a month and Mr. Hansen had been removed from control, there were over 200 charges to PayPal made in May 2016 as reflected in the June 2016 Amex Account statement. Notably, the majority of these charges were made under Mr. Hansen's card [*see* Exh. P-22], which negates his testimony that he acquired art and antiques with PayPal solely for the Mint. The Court rejects Ms. Erdmann's contention that PayPal charges were presumptively for business.

Amazon: Ms. Erdmann admitted that she bought items from this site for personal use. She believed Mr. Hansen purchased books and art from Amazon for use in the business, but

when asked to review Amex Account statements, the best she could recount was the Amazon charges "possibly" were for the Mint. Mr. Hansen said very little at trial about Amazon purchases, briefly stating that the Amex Account allowed him to buy images from Amazon and eBay for "art meetings" at the Mint. Notably, Mr. Hansen did not testify about any particular Amazon charges. The Court infers that the absence of Mr. Hansen's testimony means he could not truthfully testify the Amazon charges that Ms. Erdmann thought might "possibly" be for business were in fact for the benefit of the Mint. In addition, like so many other charges, Amazon purchases on the Amex Account continued after the Mint commenced the case and Mr. Hansen had ceded control of the company. *See* Exh. P-22.

In sum, Ms. Erdmann admitted she used the Amex Account to purchase everyday living expenses, and the Mint paid those charges with the approval of Mr. Hansen. The Court reviewed the Amex Account statements and the witness testimony, and reached its own conclusion on charges that were clearly for business and those that were likely all or at least in part personal.

The Court determined that business expense charges included the following: advertising costs, travel (and associated food and lodging costs) to cities where the Mint had operations (Reno, Maui, Green Bay, Tomball, Virginia/D.C., and San Diego) and travel and related costs for trade shows. Ms. Erdmann offered testimony that she sometimes charged expenses related to the Mint's participation in various trade shows to the Amex Account, which was not rebutted at trial. Ms. Erdmann did not offer testimony about travel to other cities, so the Court declines to include them in the business expense category. Where the charges are not clear, such as purchases of books at Amazon, Ms. Erdmann's failure to keep records precludes her from receiving the benefit of the doubt. The Court has thus estimated the following amounts charged on the Amex Account were for the benefit of the Mint:

| Statement Month & Year | New Charges | Business Expense Charges | Remaining Charges |
|---|---|---|---|
| March 2012 | $91,098.78 | $85,808.99 | $5,289.79 |
| April 2012 | $109,307.91 | $102,658.90 | $6,649.01 |
| May 2012 | $100,617.34 | $92,009.04 | $8,608.30 |

MEMORANDUM DECISION - 7

| | | | |
|---|---|---|---|
| June 2012 | $105,275.29 | $98,544.89 | $6,730.40 |
| July 2012 | $103,789.04 | $100,061.80 | $3,727.24 |
| August 2012 | $106,338.33 | $101,438.20 | $4,900.13 |
| September 2012 | $107,669.65 | $98,795.34 | $8,874.31 |
| October 2012 | $112,035.01 | $104,000.00 | $8,035.01 |
| November 2012 | $105,222.83 | $99,289.71 | $5,933.12 |
| December 2012 | $121,212.53 | $109,402.10 | $11,810.43 |
| January 2013 | $125,185.17 | $104,091.70 | $21,093.47 |
| February 2013 | $110,257.56 | $105,597.80 | $4,659.76 |
| March 2013 | $104,037.54 | $96,800.00 | $7,237.54 |
| April 2013 | $108,538.73 | $100,259.20 | $8,279.53 |
| May 2013 | $92,627.91 | $ 77,202.00 | $15,425.91 |
| June 2013 | $64,498.92 | $53,203.00 | $11,295.92 |
| July 2013 | $63,800.41 | $53,803.40 | $9,997.01 |
| August 2013 | $53,308.63 | $47,691.92 | $5,616.71 |
| September 2013 | $65,982.78 | $60,143.22 | $5,839.56 |
| October 2013 | $65,355.06 | $60,336.20 | $5,018.86 |
| November 2013 | $61,028.94 | $ 55,958.00 | $5,070.94 |
| December 2013 | $57,237.86 | $48,971.62 | $8,266.24 |
| January 2014 | $52,781.77 | $46,153.57 | $6,628.20 |
| February 2014 | $64,463.96 | $58,263.47 | $6,200.49 |
| March 2014 | $61,810.90 | $56,914.17 | $4,896.73 |
| April 2014 | $80,130.72 | $74,822.90 | $5,307.82 |
| May 2014 | $72,213.74 | $67,203.00 | $5,010.74 |
| June 2014 | $66,024.37 | $ 48,750.12 | $17,274.25 |
| July 2014 | $46,081.58 | $42,895.41 | $3,186.17 |
| August 2014 | $42,988.10 | $35,603.00 | $7,385.10 |

| September 2014 | $50,529.17 | $40,967.06 | $9,562.11 |
|---|---|---|---|
| October 2014 | $50,813.42 | $43,825.15 | $6,988.27 |
| November 2014 | $61,741.16 | $52,994.53 | $8,746.63 |
| December 2014 | $46,882.53 | $41,375.86 | $5,506.67 |
| January 2015 | $51,749.94 | $45,991.93 | $5,758.01 |
| February 2015 | $66,866.65 | $53,292.53 | $13,574.12 |
| March 2015 | $67,613.64 | $61,600.00 | $6,013.64 |
| April 2015 | $82,449.93 | $72,425.17 | $10,024.76 |
| May 2015 | $67,484.03 | $58,468.10 | $9,015.93 |
| June 2015 | $56,675.00 | $47,256.01 | $9,418.99 |
| July 2015 | $45,759.99 | $35,373.65 | $10,386.34 |
| August 2015 | $44,966.78 | $31,338.76 | $13,628.02 |
| September 2015 | $54,791.34 | $33,226.05 | $21,565.29 |
| October 2015 | $57,918.75 | $43,283.08 | $14,635.67 |
| November 2015 | $53,199.22 | $34,526.18 | $18,673.04 |
| December 2015 | $53,124.61 | $37,528.10 | $15,596.51 |
| January 2016 | $50,014.19 | $34,511.56 | $15,502.63 |
| February 2016 | $45,536.94 | $35,334.73 | $10,202.21 |
| March 2016 | $53,889.16 | $32,539.99 | $21,349.17 |

The Business Expense Charges during this period total $3,122,531.11.  Some of the Remaining Charges, in whole or in part, could have been for the business.  Nonetheless, the Court finds that the Trustee has demonstrated more than a negligible portion of the charges incurred each month were not for the benefit of the Mint.

C. The Mint Paid for the Personal Charges on the Amex Account.

Ms. Erdmann and Mr. Hansen testified that the Mint regularly paid the monthly Amex Account statements for sixteen years.  The Mint's bank statements and Amex Account statements confirm the regularity of the payments since January 2008.  From April 1, 2012, to

March 31, 2016, the Mint made 69 payments to American Express totaling $3,552,993.72 to pay the Monthly Charges incurred on the Amex Account. The Court will refer to each payment as a "Transfer" and to the payments collectively as the "Transfers." No other person or entity made any payments to American Express on the Amex Account during this period.

Ms. Erdmann was personally liable for all of the Monthly Charges, and she ensured the Mint made the Transfers each month. She testified that she directed American Express to send the bills for the Monthly Charges to her post office box in Federal Way. Because of past issues with the accounting department, she did not forward the statements to the Mint personnel for payment. Instead, she would inform the accounting department of the amount due. After obtaining authorization from Mr. Hansen to pay, the accounting department then either issued a check to Ms. Erdmann for her to send to American Express or authorized Ms. Erdmann to make the payment herself from a Mint bank account via internet or phone.

Notably, Ms. Erdmann never submitted to the Mint any receipts identifying which of the Monthly Charges were for business purposes. Mr. Hansen testified the Mint's reimbursement policy required employees to provide receipts to prove personal monies spent were for business purposes. Ms. Erdmann testified she was not aware of the policy and that she did not believe she needed to differentiate between personal and business charges because she understood from Mr. Hansen that he, the 100% owner and CEO, authorized the payment of the Monthly Charges.

Mr. Hansen offered a different explanation for how the Mint paid Ms. Erdmann's monthly Amex bill. He readily acknowledged that he authorized the Mint to pay the personal expenses he and Ms. Erdmann incurred on the Amex Account because he characterized those payments as distributions to him. He testified that Ms. Erdmann submitted the Amex Account statements to the Mint's accounting department—either Ms. Erdmann delivered hard copies or made them available to company personnel electronically. Then, according to Mr. Hansen, the people in the accounting department would take the statements and "peel them apart" to identify which charges were for business. Mr. Hansen testified that the Mint erred on categorizing charges as personal, but that such charges still were negligible compared to the business expenses in each monthly statement.

MEMORANDUM DECISION - 10

Mr. Hansen further testified that after identifying the total amount of personal charges included in each Transfer, the Mint would then record that amount as an "owner's draw" to Mr. Hansen from the Mint in lieu of a salary. He declared that his accountants approved this treatment of the payments as draws, since he was the sole owner of the company and could take distributions. Mr. Hansen further stated he disclosed the owner's draws on his federal income tax returns. He admitted, however, that he had not filed federal income tax returns since 2011, thereby refuting his own claim that he always disclosed the alleged draws to the IRS. Notably, he and Ms. Erdmann offered no tax returns from any years, offered no papers presented to or prepared by accountants, and offered no other documents showing Mr. Hansen and the Mint identified the personal charges and then treated the payments for those items as owner draws. Moreover, Ms. Erdmann's description of how the Mint paid the Monthly Charges does not match Mr. Hansen's explanation, and no other witness came forward to support his version of events. The Court finds that Mr. Hansen is not credible and declines to accept his story in the glaring absence of any documentary support or corroborating testimony.

Contrary to Ms. Erdmann's assertions, there was no agreement or understanding between her and the Mint on the treatment of the company payments of the Monthly Charges that were not reimbursable expenses. There is no credible evidence that anyone attempted to separate the business charges from the purely personal ones and record the personal charges as draws to Mr. Hansen. She had no explicit or implicit agreement that the Mint could use her Amex Account for corporate expenses in exchange for the Mint paying an unlimited amount of personal charges every month. Ms. Erdmann did not need any agreement, because her boyfriend, who was also the owner of the Mint, made sure the company paid all Monthly Charges. Ms. Erdmann and Mr. Hansen treated the Mint as if it was their personal piggy bank—they could make any personal charges on the Amex Account knowing the company would pay Ms. Erdmann's bills each month without question.

D. The Mint Experienced Financial Difficulties.

The Trustee and Ms. Erdmann agreed that at some point the Mint became insolvent and unable to pay its debts as they became due. The Trustee attempted to prove the Mint was

insolvent as far back as the end of 2008. Ms. Erdmann, however, conceded only that entry of the multi-million dollar judgment in early 2016 rendered the Mint insolvent.

The Trustee served as his own expert on the financial condition of the Mint. He analyzed numerous documents and synthesized his findings in an Insolvency Schedule showing the Mint was significantly insolvent on a balance sheet basis at the end of every year from December 2008 through the Petition Date. Exh. P-30. According to the Trustee, the Mint's liabilities exceeded its assets at year-end by at least $19 million each year and by $45.5 million when it filed bankruptcy.

The Trustee acknowledged, however, that the Mint's records were incomplete and required him to make educated guesses as to some of the line items on his exhibit. For example, he used the same inventory figure of $4,651,158.00 every year; he explained that he had no inventory records, the bank statements indicated that inventory came in and went out of the company continuously, and it was cost-prohibitive to try to make an accurate determination of the amount of inventory on hand at the end of each year.

The Trustee also explained that he allocated portions of certain substantial liabilities the Mint owed over a period of years. For example, the entry of a $12.5 million jury verdict in early 2016 liquidated the liability entitled "Cohen Litigation Payable." The Insolvency Schedule shows a liability for this line item of $2.5 million at the end of 2012, $5 million at the end of 2013, $7.5 million at the end of 2014, $10 million at the end of 2015, and $12.5 million as of April 1, 2016. The Trustee testified that there were points in the litigation that one could estimate the Mint would be held liable for some portion of the total ultimate liability. However, the Trustee did not sufficiently explain how or why he determined the Mint was likely to be liable for exactly 1/5 of the ultimate amount at the end of each year. His Insolvency Schedule references an Exhibit 19 that might shed some light on his analysis, but the Trustee did not provide that document to the Court. The liabilities entitled Cohen Toxin clean up, Nevada EPA, and EEOC suffer from the same deficiencies: the exhibits referenced on the Insolvency Schedule (20, 21, and 22) are missing and the Trustee's testimony was not sufficient to substitute for

documents (e.g., copies of claims, complaints, demands) to explain how he estimated the liability for each item at each point in time.

The Trustee also testified the Mint was operating under a consent decree when it filed for bankruptcy protection. Entered in 2008 in the State of Washington, the consent decree provided that if the Mint did not deliver product to a customer within the time frame promised, the Mint would return the money or deliver additional gold or silver to unsatisfied customers. The Trustee testified the Mint had a terrible reputation for delivering goods late to customers when compared to industry standards, but he did not identify the source of his information for either the Mint's alleged reputation or the supposed industry standards. Upon cross-examination, the Trustee acknowledged he was not aware of any action by the State of Washington to enforce violations of the consent decree or any complaints filed by customers alleging the Mint had violated the decree.

The Trustee conducted a detailed analysis of individual customer orders and the days between promised delivery date and the actual delivery date. From the end of 2008 to the end of 2010, the Mint delivered product fairly close to within the timeframe promised to customers. His analysis showed that in 2010 the Mint began delivering product several days beyond the promised date. With respect to silver sales, using the most generous average promised days for delivery (which was 70), by the end of 2011, the average days for actual delivery was nearly 100. That number increased to over 120 days by the end of 2012, remained at above 120 days through 2013, decreased to about 80 days by the end of 2014, and went back up to about 90 days by the end of 2015. *See* Exh. P-33. With respect to gold sales, using the most generous average promised days for delivery (which again was 70), by the end of 2011, the average days for actual delivery was 80. That number increased to nearly 120 days by the end of 2012, remained at 116 days through 2013, and returned to the average promised number of days by the middle of 2015. *See* Exh. P-34. In short, the Trustee demonstrated that by the end of 2011, the Mint was no longer able to deliver silver and gold by the dates it had promised to customers.

Ms. Erdmann did not offer any expert testimony, and relied on Mr. Hansen to testify as a lay witness on the Mint's financial condition. He acknowledged that the Mint became involved

in legal battles in 2010 with its former landlord, Cohen Asset Management ("Cohen"), over environmental clean-up issues and defamation claims Cohen asserted against the Mint. With respect to the environmental issues, Mr. Hansen estimated the Mint's clean-up costs, lost revenue, and litigation expenses were in the range of $10–15 million over a four-year period. In early 2016, Cohen obtained a $12 million judgment for defamation against the Mint. In the view of Mr. Hansen, the Mint was solvent up until entry of the Cohen judgment.

Mr. Hansen vigorously attacked the Trustee's Insolvency Schedule. He pointed to the Mint's bank statements, which showed the company had between $2.3 million and $3.6 million coming into and going out every month. Mr. Hansen asserted that this consistent cash flow demonstrated the Mint was solvent. However, he failed to explain how the company could be still solvent when cash flow remained the same while the costs relating to the disputes with Cohen began to soar. Importantly, Mr. Hansen admitted the Mint was unable to make regular payments to creditors beginning in 2015 due to the costs of the Cohen litigation.

Mr. Hansen challenged the Trustee's decision to include portions of certain obligations as liabilities in years prior to the ultimate liquidation of the obligations. In particular, Mr. Hansen contended that the Mint disputed the Nevada EPA, the EEOC, and Cohen Litigation Payable obligations and argued there was no basis to estimate any portion of those amounts to the liability column prior to the time of their actual liquidation. He also claimed the Trustee greatly overstated the Allowance of Doubtful Accounts. The Trustee testified that he considered any receivable over 90 days old as uncollectible. Mr. Hansen countered that the Mint entered into many contracts with the U.S. government, an entity that always paid in full but often more than 90 days after issuance of an invoice. Mr. Hansen also testified—without reference to any record or document—that accounts receivable ranged between $2 million and $20 million at any given time between 2008 and the Petition Date. This huge range is enough for the Court to discount Mr. Hansen's testimony, but his lack of any supporting evidence—a situation created by his failure or refusal to maintain financial records—makes his allegations completely unreliable. Nonetheless, the lack of financial and accounting records greatly hampered the Trustee's ability to determine the assets and liabilities of the Mint during the relevant period.

Mr. Hansen also disputed that the Mint failed to comply with the Consent Decree entered into with the State of Washington. While admitting there were some delays in getting products to customers, Mr. Hansen testified that when customers complained, the Mint always either refunded their money or provided extra commodities to the customer.

The Court conducted its own review of the evidence. The Accounts Payable Aging Schedule identifies obligations the Mint owed to vendors, and for each vendor states the amount that is current, the amount due for more than 30 days, the amount due for more than 60 days, and the amount due for more than 90 days. Exh. P-28. Beginning in 2012, the Schedule indicates the Mint started falling behind in payments to several venders:

| Amounts* | Marten Law | Mendoza Law | Yong Tuo Emblem | Young deNormandie |
|---|---|---|---|---|
| **12/31/2011** | | | | |
| Total due | 62 | -- | 659 | 41 |
| Current | 62 | -- | 132 | 41 |
| Over 90 days | 0 | -- | 254 | 0 |
| **12/31/2012** | | | | |
| Total due | 156 | 23 | 587 | 374 |
| Current | 4 | 0 | 103 | 42 |
| Over 90 days | 143 | 15 | 266 | 163 |
| **12/31/2013** | | | | |
| Total due | 104 | 36 | 370 | 440 |
| Current | 0 | 0 | 14 | 0 |
| Over 90 days | 104 | 22 | 163 | 440 |
| **12/31/2014** | | | | |
| Total due | 140 | 83 | 451 | 577 |
| Current | 0 | 0 | 0 | 0 |
| Over 90 days | 140 | 83 | 227 | 577 |

**12/31/2015**

| | | | | |
|---|---|---|---|---|
| Total due | 140 | 88 | 548 | 744 |
| Current | 0 | 0 | 102 | 8 |
| Over 90 days | 140 | 88 | 150 | 729 |
| **3/31/16** | | | | |
| Total due | 141 | 89 | 292 | 800 |
| Current | 0 | 0 | 0 | 56 |
| Over 90 days | 141 | 89 | 161 | 744 |

*Amounts in thousands of dollars, rounded to nearest $1,000.00.

Notably, this handful of vendors comprised a significant percentage of the total amount the Mint owed at the end of each year.[1]  *See* Exh. P-28.  Three of these vendors provided legal services,[2] which comports with Mr. Hansen's testimony that litigation costs caused the Mint to begin to default on its obligations.  While Mr. Hansen asserted the accounts payable issues did not arise until 2015, the records indicate the problem began well before then.

## II.    CONCLUSIONS OF LAW

A.  The Court Has Jurisdiction and the Authority to Enter Final Judgments.

This Court has jurisdiction by virtue of 28 U.S.C. §1334(b).  This matter is a core proceeding described by 28 U.S.C. §157(b)(2)(H) and (O).  Both the Trustee and Ms. Erdmann consent to this Court entering final orders and judgments.  Dkt. Nos. 10 and 31, at 2.

B.  Ms. Erdmann's Proposed Amendment to the Pleadings Would Be Futile.

Prior to resting her case, Ms. Erdmann made an oral motion at trial to amend the pleadings to include the affirmative defense of set-off.  Ms. Erdmann desires to amend so she

---

[1] The total amount owed to these four vendors represented at least 27% of the total amount owed to all vendors between the end of December 2011 and the end of March 2016.  At the end of 2015, the total owed to these four accounted for approximately 61% of the Mint's debt.

[2] In addition to Marten Law and Mendoza Law, per Proof of Claim No. 2675-1 filed in the main case, Young deNormandie, P.C. provided services to the Mint in connection with a number of legal disputes.

MEMORANDUM DECISION - 16

may offset the approximately $1,700 in expenses on the Amex Account incurred for a tradeshow trip in March that she paid post-petition after the Mint ceased paying the monthly Amex Account statements. The Trustee opposed the request, and the Court requested and received additional briefing from the parties on the matter.

Fed. R. Civ. P. 15(b), made applicable by Fed. R. Bankr. P. 7015, governs amendments to pleadings during and after trial. Subsection 15(b)(1) provides that where a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended if the evidence would not prejudice the objecting party's action or defense on the merits. Subsection (b)(2) provides that an amendment may be made where issues not raised by the pleadings are tried by the parties' express or complied consent. "The purpose of Rule 15(b) is to authorize amendments to conform the pleadings to issues or evidence that appear for the first time at trial." *EEOC v. Hay Assocs.*, 545 F. Supp. 1064, 1070 (E.D. Penn. 1982). A court may deny leave to amend if the amendment would be "an exercise in futility." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (citation omitted).

The Court concludes that the proposed amendment would be futile. First, a defendant cannot use a general pre-petition claim to offset a fraudulent transfer claim. *In re Acequia, Inc.*, 34 F.3d 800, 817 (9th Cir. 1994). Allowing such a setoff would defeat the purpose of recovering fraudulent transfers to redistribute the recoveries among creditors on a pro rata basis: "[t]he right to offset is denied, because the estate has been depleted to the detriment of creditors of like class, and to allow the right of set off would perpetuate the depletion." *Id.* (citations omitted). Second, the Court must disallow Ms. Erdmann's unsecured claim to the extent that the Trustee obtains a judgment against her on his fraudulent transfer claims unless she has "paid the amount, or turned over any such property, for which such entity or transferee is liable." 11 U.S.C. § 502(d). Ms. Erdmann cannot set off a disallowed claim against a judgment entered in favor of the Trustee. The Court therefore denies Ms. Erdmann's oral motion to amend her answer.

C. <u>Trustee May Utilize his Strong-Arm Powers to Reach All of the Transfers.</u>

Trustees in bankruptcy court may avoid fraudulent transfers made by the debtor within two years of the filing of the bankruptcy petition. 11 U.S.C. § 548. Bankruptcy trustees also

have "strong arm powers" under 11 U.S.C. § 544(b) to avoid fraudulent transfers under state law. The existence of a section 544(b) cause of action depends upon whether a creditor existing at the time of the transfers still had a viable claim against the debtor on the petition date. *Acequia, Inc.*, 34 F.3d at 807.

Under the Washington Uniform Fraudulent Transfer Act ("WUFTA"),[3] there are two species of fraudulent transfers: constructive fraud and actual fraud. The Trustee asserts the Transfers may be recovered under RCW § 19.40.041(a)(1) (defining actual fraudulent transfers) and § 19.40.041(a)(2) (defining constructive fraudulent transfers). A creditor may bring a claim for relief with respect to a constructive or actual fraudulent transfer under these statutes within four years of the transfer. RCW § 19.40.091(a) and (b).

As of April 2012 and through the Petition Date, numerous creditors of the Mint had viable claims under the WUFTA, as evidenced by the list of Accounts Payable. *See* Exh. P-28. Mr. Hansen also acknowledged the $12.5 million judgment that the Cohen Group obtained against the company that caused the Mint to seek protection under the Bankruptcy Code. For good reason, Ms. Erdmann does not challenge the Trustee's ability to attempt to recover allegedly avoidable transfers made by the Mint within four years of the Petition Date.

Ms. Erdmann does object, however, to any attempt by the Trustee to recover payments made to American Express before April 1, 2012. The Court concludes that the Trustee did not preserve for trial the ability to pursue these older transfers. A pretrial order has the effect of amending the pleadings. *In re Hunt*, 238 F.3d 1098, 1101 (9th Cir. 2001). While the amended complaint prays for recovery of payments on the Amex Account made eight years before the petition date, the Pretrial Order [Dkt. No. 88] indicates that the Trustee seeks judgment for only those payments made from April 2012 forward. Notably, in his initial proposed findings of fact and conclusions of law filed with his trial brief [Dkt. No. 85-1], the Trustee did not include any proposed findings on payments prior to April 2012, defined the payments made in and after April 2012 as the "Transfers," and requested judgment only for the Transfers plus interest on each of

---

[3] Statutory references to the Washington Uniform Fraudulent Transfer Act refer to the statutes that were in effect in 2016. In July, 2017, the relevant statutory provisions were amended by the adoption of the Uniform Voidable Transactions Act (the "UVTA"). Per RCW § 19.40.905 (2017), the UVTA does not apply to transfers made or obligation incurred prior to July 23, 2017.

MEMORANDUM DECISION - 18

the Transfers. Therefore, the Trustee is not entitled to a pursue recovery of any payments made by the Mint prior to April 2012.

D. <u>The Transfers Were Constructively Fraudulent.</u>

Under the WUFTA, a transfer made by a debtor is fraudulent to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) without receiving reasonably equivalent value in exchange for the transfer or obligation; and (2) the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due. RCW § 19.40.041(a)(2).

Constructive fraud must be shown by "substantial evidence." *Clearwater v. Skyline Constr. Co. Inc.*, 67 Wash. App. 305, 321, 835 P.2d 257 (Wash. App. 1992), *review denied*, 121 Wash.2d 1005, 848 P.2d 1263 (Wash. 1993). The burden of proof rests on the party alleging the fraudulent transfer. *Sedwick v. Gwinn*, 73 Wash. App. 879, 885, 873 P.2d 528 (Wash. App. 1994).

1. *The Mint Did Not Receive Reasonably Equivalent Value in Exchange for Each Transfer.*

When the immediate benefit flows to an identifiable non-debtor third party (in this case, the immediate benefit was to Diane Erdmann, whose bills were being paid and who was receiving bonus points), the burden of production lies on the defendant to show that the debtor received some sort of cognizable benefit. *See, e.g.*, *In re Yellowstone Club*, 436 B.R. 598, 666 (Bankr. D. Mont. 2010) (it is the defendant's burden to produce evidence of indirect benefit that is tangible and concrete, and to quantify its value); *In re Minn. Util. Contracting, Inc.*, 110 B.R. 414, 417–18 (Bankr. D. Minn. 1990); *In re Brooke Corp.*, 541 B.R. 492, 511 (Bankr. D. Kan. 2015) ("If the Trustee proves the absence of a direct benefit to the Debtor, the burden then shifts to [the defendant] to show the Debtor received an indirect benefit").

The standard for judging whether reasonably equivalent value has been exchanged is more strict for transactions involving cash. *See In re Bennett Funding Grp., Inc.*, 232 B.R. 565, 572 (Bankr. N.D.N.Y. 1999) ("the range of non-fraudulent discounts is much narrower for transactions involving cash, cash substitutes, or commodities with readily ascertainable market values"); *see also In re Hedged-Investments Assocs., Inc.*, 84 F.3d 1286, 1290 (10th Cir. 1996) (in analyzing transfers received by investor in debtor's Ponzi scheme, no value was given for payments received by investor in excess of principal investment).

Ms. Erdmann claims that the value exchanged was reasonably equivalent because the extra payment made by the Mint for personal charges was negligible. First, the Court found that the personal charges were not negligible—the charges were in the thousands of dollars every month. *See supra* Part I.B. Second, the Court rejects this notion that a company may reimburse individuals for corporate expenses and then give that person an extra amount, even if negligible, for no reason. Whether large or small, the extra payment is not equivalent to the value when the value is a precise and known dollar amount. As the Trustee noted at trial, additional payments, even tiny ones, made over a long period of time will add up for the recipient.[4] Moreover, whether she purchased the items for the Mint herself or allowed Mr. Hansen to use the card for business items, it is unreasonable to expect the Mint would reimburse her for more than the amount spent on purchases that benefitted the business, in violation of its own reimbursement policy.

Ms. Erdmann asserts she also conferred value by allowing the Mint to use her personal account to purchase corporate expenses. First, Ms. Erdmann and Mr. Hansen testified that she was able to obtain a $150,000 line of credit on her Amex Account, while Mr. Hansen and the Mint could not secure a limit that large. As the Trustee pointed out, Ms. Erdmann had no income or other obvious ability to repay monthly bills of that size. The Court concludes she

---

[4] One may find an example of this phenomenon in the film *Office Space* (Twentieth Century Fox, 1999), where three employees at the fictional Initech infect the company's accounting system with a computer virus designed to divert fractions of pennies into a bank account. The trio believes such transactions are small enough to avoid detection but will result in a substantial amount of money over time. Unfortunately, a bug in the code caused their virus to steal over $300,000 in just a few days. Fortunately for the employees, an act of arson (by someone else) results in the Initech building going up in flames, destroying all evidence of the missing money. To be clear, *Office Space* is a comedy.

obtained the large credit limit because the Mint paid her bills each month like clockwork—thereby enabling Ms. Erdmann to achieve a high level of credit-worthiness the Mint could have secured for itself.

Next, Ms. Erdmann claims she transferred value by providing the Mint unsecured, unlimited access to her Amex card knowing that if the Mint failed to pay, she would be responsible to Amex. The Court notes, however, that she did not give the Mint access to her card: rather, she gave her boyfriend access to the card, who used it for both personal and business expenses. The Court also rejects any notion that she was extending short-term credit to the Mint. She insisted that the Mint pay the monthly statements as soon as she received them.

Further, the Court concludes the arrangement provided far greater benefits to Ms. Erdmann. For many years, the Mint paid for her bills directly to American Express. Thus, the company paid for virtually all of her personal expenses; until the Mint filed for bankruptcy, she never had to actually pay for anything. In contrast, Mint employees who incurred expenses related to business would have to pay the bill and then document the expense before receiving reimbursement. And by having the Mint pay her personal expenses, Ms. Erdmann did not need to receive a salary from the Mint—thereby allowing her to avoid paying federal income taxes. The Court declines to conclude that Ms. Erdmann conveyed value by allowing the Mint to use her card because she received more value by having the Mint pay her personal bills *and* obtaining millions of dollars in rewards points for her personal use.

> 2. *At the Time of Each of the Transfers, the Mint Should Have Known it Was Unable to Pay Its Debts as They Became Due.*

A transfer made without adequate consideration is constructively fraudulent where any one of the following exists: (1) the debtor was left by the transfer with unreasonably small assets for a transaction or the business in which the debtor was engaged, RCW § 19.40.041(a)(2)(i); (2) the debtor intended to incur, or believed he or she would incur, more debts than the debtor would be able to pay, RCW § 19.40.041(a)(2)(ii), or; (3) the debtor was insolvent at the time or as a result of the transfer, RCW § 19.40.051(a). *Clearwater*, 67 Wash. App at 266. Under the WUFTA, a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's

assets, at a fair valuation. RCW § 19.40.021. The Trustee attempted to show that since the beginning of 2012, the Mint was insolvent on a balance-sheet basis or, in the alternative, that the Mint was unable to pay its debts when they became due.

When a debtor fails to keep accurate or complete records, a subsequently-appointed bankruptcy trustee may be hampered in his or her ability to prove insolvency. Nonetheless, even if the trustee is without fault, a court cannot overlook the lack of underlying support and grant much weight to an expert report based upon scant or unreliable evidence. *In re KZK Livestock, Inc.*, 290 B.R. 622, 631 (Bankr. C.D. Ill. 2002) (giving little weight to trustee's expert report and then ruling against the trustee on the issue of insolvency, noting the trustee had done the best he could with what he had but was unable to overcome the unreliability inherent in the debtor's poor recordkeeping).

In this case, the Trustee acknowledged the poor recordkeeping by Mr. Hansen at the Mint. Mr. Hansen used his failure to keep records as a weapon to attack Trustee's conclusions, and then offered his own numbers, free of any supporting evidence or even logical reasoning in some instances. Nonetheless, the lack of reliable data on assets such as inventory and accounts receivable precludes affording substantial weight to the Trustee's Insolvency Analysis. It also bears repeating that the Trustee did not provide some of the critical underlying data used for his calculations, such as information on the Cohen Litigation Payable and the EEOC claims. The Trustee also did not engage an uninterested person to serve as an expert but instead relied solely on his own analysis. Since the Trustee has an interest in the outcome of the litigation, his bias requires the Court to discount the expert report even further. In sum, the Court affords little weight to the Trustee's Insolvency Schedule captured in Exh. P-30.

The evidence does, however, support the conclusion that Mr. Hansen knew, or at least should have known, that the Mint was unable to pay its debts as they became due. Since the end of 2011, the Mint clearly fell behind on obligations to four substantial vendors. Not coincidentally, the Mint became embroiled in litigation with Cohen and others in 2012. These legal expenses caused the Mint to either pay slowly or make no payment at all to certain creditors. In addition to the delayed payments, the records show that the Mint fell behind on

fulfilling gold and silver orders in 2012 and the problems persisted until the Petition Date. Finally, Mr. Hansen testified that he did not file tax returns for tax year 2012 and thereafter because the Mint experienced losses, and therefore, he had no income to report. The company's losses for those years corroborate the Trustee's conclusions that the Mint was either insolvent or unable to pay its obligations as they became due since April 2012.[5]

E.  The Trustee Did Not Prove the Transfers Were Actually Fraudulent.

The Trustee also seeks to use his strong arm powers of 11 U.S.C. § 544 to recover the Transfers as actual fraudulent transfers under RCW § 19.40.041(a)(1).  Under this statute, a transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud a creditor of the debtor.  The party asserting an actual intent to defraud must provide "clear and satisfactory proof." *Clearwater*, at 321.  Clear and satisfactory proof is between "preponderance of the evidence" but less than "beyond a reasonable doubt." *Nw. Elec. Co. v. Fed. Power Comm'n*, 134 F.2d 740, 743 (9th Cir. 1943).

In determining actual fraudulent transfers, the Court may consider circumstantial evidence of intent. *United States v. Black*, 725 F. Supp.2d 1279, 1291 (E.D. Wash. 2010).  The Court may consider eleven specific factors enumerated in the WUFTA, as well as other factors not specifically identified that may impact the Court's determination of intent.[6] *Sedwick*, 73 Wash. App at 886–87.

---

[5] While the Court has determined that the Trustee did not preserve claims to recover avoidable transfers prior to April 1, 2012, the Court also notes the evidence does not support a conclusion that the Mint was insolvent prior to that date either.  Due to the lack of records, the Court cannot rely on the Trustee's Insolvency Analysis.  The Accounts Payable Aging chart (P-28), Average Delivery Days – Silver chart (P-33) and Average Delivery Days – Gold chart (P-34) all indicate the Mint was meeting its obligations when they came due until the end of 2011.  And while he produced no tax returns, Mr. Hansen testified that he filed personal tax returns for tax years 2008 through 2011 because the Mint generated income for him.  Consequently, the Trustee could not meet his burden to demonstrate insolvency for those earlier years.

[6] These factors, known as the "badges of fraud," consist of the following: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the

The Court concludes the Trustee did not meet his burden to show an actual intent to defraud. Ms. Erdmann and Mr. Hansen testified that they used the Amex Account for business and personal charges for approximately 16 years. While the Court agrees with the Trustee that Ms. Erdmann was an insider at all times, the Trustee failed to prove the Mint paid the Amex Account bills each month to avoid paying other creditors. Rather than attempting to secret away money, Mr. Hansen caused the Mint to cover his and Ms. Erdmann's daily living expenses. Mr. Hansen and Ms. Erdmann may have intentionally defrauded the IRS by failing to disclose income, but the Trustee did not demonstrate that the *Mint* intended to hinder, delay, or defraud any of *its* creditors.

F.  The Trustee is Entitled to a Judgment Against Ms. Erdmann for the Total Amount of the Transfers Less the Charges on the Amex Account Incurred for the Benefit of the Mint.

Under the WUFTA, a creditor may avoid a fraudulent transfer. RCW § 19.40.071(a)(1). The avoidance, however, is subject to RCW § 19.40.081. *Id.* Under that latter statute, a creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against the first transferee of the asset or the person for whose benefit the transfer was made. RCW § 19.40.081(b). A judgment based upon the value of the asset transferred must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require. RCW § 19.40.081(c). This equitable adjustment is available to good faith transferees who have provided value to the debtor. RCW § 19.40.081(d); *Thompson v. Hanson*, 168 Wash.2d 738, 749–50 (Wash. 2009).

The Washington Supreme Court explained that RCW § 19.40.081(b) limits liability to the value of the property received by the transferee and, for good faith transferees, subsection (d) further limits liability to the net value received (the value of the asset transferred less the value given the debtor). The value given to the debtor, including any debt assumed, is deducted from the value of the asset transferred prior to determining the measure of judgment. Subsection (c) is the means by which this occurs, as it allows for the adjustment to the value of the asset

essential assets of the business to a lienor who transferred the assets to an insider of the debtor." RCW § 19.40.041(b).

transferred.  Under this interpretation, a good faith transferee is liable to a debtor's creditors only for the net value (the total value of the asset less consideration given) while a non-good-faith transferee is liable for the full value of the asset, regardless of consideration given.  *Thompson*, 168 Wash.2d at 752.  The party seeking a reduction of the liability based on value given by a good-faith transferee bears the burden of proof of this defense.  *In re LLS America, LLC*, 520 B.R. 841, 846 (E.D. Wash. 2014) (interpreting both 11 U.S.C. § 548 and WUFTA).

All of the Transfers to American Express were constructively fraudulent transfers and therefore may be avoided.  However, pursuant to RCW § 19.40.071(a), any recovery for the avoidable Transfers is subject to reduction for any value given to the Mint by a good faith transferee or obligee.[7]

Technically speaking, Ms. Erdmann is neither a transferee nor an obligee, since she did not receive any of the Transfers and none of the Transfers created an obligation to her.  American Express is the only entity that can be the transferee of the Transfers.  The Court easily concludes that American Express received the Transfers in good faith, as it had no way of knowing the Mint was paying the personal expenses of the owner of the company and his girlfriend.  Accordingly, any avoidance judgment should be reduced by the value given to the Mint for the Transfers.  American Express provided some value to the Mint with each Transfer, namely the items purchased on the Amex Account that were for the Mint's business.

As noted above, the Court determines that, based on its own analysis of the Amex Account Statements, $3,122,531 of the Transfers constituted Mint business expenses.  The Court declines to give Ms. Erdmann credit for any of the Remaining Charges that may or may not have benefitted the company.  For example, Ms. Erdmann testified that most of the purchases at the Grocery Stores were for the Mint.  She acknowledged, however, that some portion of virtually every transaction included personal items.  The evidence also shows that even after the Mint was

---

[7] The limitation of a judgment under RCW § 19.40.081(b)(1) to the lesser of the net value of the asset transferred and the amount necessary to satisfy the creditor's claim does not apply here.  When a trustee utilizes his strong arm powers to recover fraudulent transfers under state law, the judgment is not limited to the amount necessary to satisfy the claim of the so-called "golden creditor" and the trustee may recover the entire fraudulent transfer: "If the transfer is avoidable at all by any creditor, it is avoidable in full for all creditors regardless of the dollar amount of the prevailing claim."  *Acequia, Inc.*, 34 F.3d at 809–10 (9th Cir. 1994), *citing Abramson v. Boedeker*, 379 F.2d 741, 748 n.16 (5th Cir. 1967); *see also In re Imageset, Inc.*, 299 B.R. 709, 715 n.10 (Bankr. D. Me. 2003).

MEMORANDUM DECISION - 25

in bankruptcy and Ms. Erdmann and Mr. Hansen no longer bought items for the business, they continued to use the Amex Account to make purchases at the Grocery Stores at almost the same rate. Her failure to keep records that would show which portion of the Grocery Store purchases benefitted the Mint precludes her from receiving a credit for any value allegedly conveyed to the Mint. In the end, Ms. Erdmann may reduce the amount that may be avoided by the purchases the Court has determined constituted business expenses.

In sum, the Trustee may avoid the net value of the Transfers ($3,552,993 less $3,122,531) in the amount of $430,462.00. Since the Mint had no obligation to American Express, and each of the Transfers satisfied Ms. Erdmann's obligations to American Express, the Mint made these Transfers for the benefit of Ms. Erdmann. Consequently, the Trustee may recover this net amount from Ms. Erdmann. *See* 11 U.S.C. § 550(a)(1). Because the Trustee may recover the net value of all of the Transfers made four years before the Petition Date, the Court need not reach the Trustee's alternative claims to recover those Transfers made within two years of the Petition Date under section 548 of the Bankruptcy Code.

G. Since the Trustee Has an Adequate Remedy at Law, He May Not Pursue Claims for Unjust Enrichment.

The Trustee also sought the remedy of unjust enrichment as another basis to recover the Transfers. Since the Trustee has prevailed on his constructive fraudulent transfer claim, he need not rely on this alternative theory. Even if he did not succeed under the WUFTA, the Trustee may not pursue this equitable remedy since he has an adequate remedy at law under both Federal and Washington state fraudulent transfer law. *Seattle Prof'l Eng'g Emps. Ass'n v. The Boeing Co.*, 139 Wash.2d 824, 839 (Wash. 2000) (employees not entitled to pursue equitable remedy for restitution when they had adequate legal remedy under state law).

H. The Trustee is Entitled to Only Post-Judgment Interest at the Federal Judgment Rate.

The Trustee requests prejudgment interest at the rate of 12% per annum on the amount of each Transfer until the date of judgment to an award of post-judgment interest at the rate of 12% per annum. The Court declines to award any prejudgment interest and will order that interest accrue post-judgment at the federal judgement rate.

The Trustee asserted causes of action under section 548 of the Bankruptcy Code and under the WUFTA by virtue of section 544 of the Bankruptcy Code. In seeking prejudgment interest "at the statutory rate of 12 percent per annum," the Trustee is presumably asserting the Bankruptcy Court has pendant jurisdiction over this matter. However, the Trustee's complaint pleads that the Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334(b). The Trustee has not asserted supplemental jurisdiction of the Court over the Washington state law claims under 28 U.S.C. § 1367 ("district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form the same case or controversy"). Thus, on the face of the complaint, the Trustee has alleged only federal question jurisdiction, and the Court concludes this is a federal question case.

When a court maintains federal question jurisdiction, the decision whether to award prejudgment interest is a matter within the court's discretion, to be decided according to federal law. *Wessel v. Buhler*, 437 F.2d 279, 284 (9th Cir. 1971); *see also United States v. Pend Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1553 (9th Cir. 1994). Prejudgment interest is not a penalty, but a means of making a wronged plaintiff whole. *See In re Exxon Valdez*, 484 F.3d 1098, 1101 (9th Cir. 2007). The determination of prejudgment interest is a "question of fairness, lying within the Court's sound discretion, to be answered by balancing the equities." *Wessel*, 437 F.2d at 284; *see also Pend Oreille*, 28 F.3d at 1553 ("The cases teach that interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable.") (quoting *Bd. of Cnty. Comm'rs v. United States*, 308 U.S. 343, 352 (1939)).

Under federal law, "the rate of prejudgment interest is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate." *United States v. Gordon*, 393 F.3d 1044, 1058 n.12 (9th Cir. 2004); *see also W. Pac. Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1289 (9th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Blankenship v. Liberty Life Assurance Co.*, 486 F.3d 620, 628 (9th Cir. 2007).

Balancing the equities of this case, the Court will not award the Trustee prejudgment interest. While Ms. Erdmann was not a completely innocent party, as she knew that the Mint was paying her personal expenses, Mr. Hansen led her to believe the payments were appropriate and authorized. In addition, the evidence was not sufficient to prove that Ms. Erdmann knew the Mint was experiencing difficulties paying it debts and meeting gold and silver deliveries. The Court is imposing a sizable judgment against Ms. Erdmann. These facts do not warrant adding prejudgment interest to the award.

As for post-judgment interest, 28 U.S.C. § 1961 sets forth the federal judgment rate, which applies to civil and bankruptcy adversary judgments. While parties may contractually agree to waive the application of this statute, there is no evidence here that the parties intended to "contract around" section 1961. *See Cataphora v. Parker*, 848 F.Supp.2d 1064, 1074–75 (N.D. Cal. 2012) ("[A]n exception to section 1961 exists when the parties contractually agree to waive section 1961's application.") citing *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1023 (9th Cir. 2004) (promissory notes at issue included an express, mutually-agreed upon interest rate in the case of default). Accordingly, the Court orders that the judgment against Ms. Erdmann shall bear interest at the federal judgment rate in effect as of the date of entry of the judgment.

## III.     CONCLUSION

For years, the Mint paid Ms. Erdmann's Amex Account bills that included personal charges for the daily living expenses of Ms. Erdmann and Mr. Hansen. More than four years before filing for bankruptcy protection, the Mint knew or should have known that it was unable to meet its obligations as they became due. As a consequence, the Mint's payments to American Express that were, at least in part, for personal expenses constituted constructively fraudulent transfers under the Washington Uniform Fraudulent Transfer Act. The Trustee shall be awarded judgment against Ms. Erdmann in the amount of those payments less the Amex Account charges

for business expenses, for a total judgment amount of $430,462.00, plus post-judgment interest at the federal judgement rate. The Trustee's remaining claims shall be dismissed. The Court will enter a separate judgment, pursuant to Federal Rule of Bankruptcy Procedure 7058 and Federal Rule of Civil Procedure 58, consistent with this Memorandum Decision.

/// END OF MEMORANDUM DECISION ///